**Opinion issued March 6, 2018**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-17-00739-CV

_____

## IN THE INTEREST OF K.G.-J.W. A/K/A K.W., A CHILD

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-04631J**

---

## MEMORANDUM OPINION

Following a bench trial, the trial court signed a judgment terminating the parent-child relationship between M.C.M. ("Mother") and her one-year-old daughter, K.G.-J.W. A/K/A K.W. ("K.W."). In one issue, Mother contends that the evidence was not factually sufficient to support the trial court's determination that termination of her parental rights was in K.W.'s best interest.

We affirm.

**Background**

K.W. was born on August 16, 2016. That same day, the Department of Family and Protective Services (the Department) received a referral, alleging "neglectful supervision" by Mother of newborn K.W. The report informed the Department that Mother was incarcerated for the offense of "harassment of a public servant" at the time of K.W.'s birth. No relative had been located who could care for the newborn. K.W.'s father, who is married to Mother, told the Department that he was not prepared to care for K.W.

The Department was also concerned because Mother's and Father's parental rights to K.W.'s older sister (Sister), born in 2013, were terminated in 2014. In that case, the Department had received a referral in April 2013 regarding then-seven-month old Sister. According to the report, Mother had a long history of drug use and continued to use drugs on a daily basis while caring for Sister. The report alleged that Mother would hallucinate, causing her to forget that she had a baby.

The Department had conducted an investigation, speaking to relatives who corroborated the allegations. During the investigation, the Department confirmed that both Mother and Father had a history of illegal drug use. The Department's investigator also discovered that Mother had been diagnosed with bipolar disorder but had not been taking her medication for the disorder.

The investigator also learned that, on April 14, 2014, Mother was arrested because she had been driving at a high rate of speed. Mother told the arresting officer that she was "running from the devil."

After the speeding incident, Mother was taken to the hospital where she was interviewed by the investigator. Mother stated that she did not know why she had been arrested. She also did not know her mental health status but admitted that she had stopped taking her medication.

Ultimately, in August 2015, the trial court signed a decree terminating the parent-child relationships between Sister and Mother and Sister and Father. The trial court found that Mother had voluntarily relinquished her parental rights to Sister. The trial court also found that Father had engaged in conduct that endangered Sister and that termination of his parental rights was in her best interest. Sister was placed with a maternal relative but, after sustaining an injury, was removed from the relative's care. Sister was then placed with a paternal relative.

In October 2015, Mother committed the third-degree felony offense of harassment of a public servant. The complaint alleged that Mother had caused a public servant "to contact [Mother's] saliva" while the public servant was discharging a public duty. Mother pleaded guilty to the offense in August 2016. The criminal district court placed her on deferred adjudication community supervision for six years. The record indicates that Mother was incarcerated from

June 2016 until November 2016. However, it is unclear whether her incarceration for the entire period was related to the harassment of a public servant offense.

While in jail, Mother gave birth to K.W. in August 2016. Three days after K.W.'s birth, the Department filed the instant suit, seeking emergency orders to obtain possession of K.W. and requesting appointment as K.W.'s temporary managing conservator. The trial granted the emergency orders and the temporary managing conservator appointment. In its petition, the Department also requested that the trial court terminate Mother's and Father's parental rights and sought sole managing conservatorship of K.W. if family reunification could not be achieved.

Mother submitted to drug testing in September 2016 and in October 2016. In both instances, Mother's hair follicles tested positive for cocaine.

The Department developed a family service plan for Mother on October 3, 2016. The service plan gave the following reason for Child Protective Services' involvement with K.W.: "Mother was incarcerated at the time of the birth of the child and would be returning to jail after the birth of the baby. [Mother] has been incarcerated since 6/7/2016, mother has a history of using cocaine, marijuana and PCP. Serving time for harassment of a public servant." Among the Department's concerns stated in the service plan were the following:

- "The level of concern is extreme for child vulnerability. The agency has concerns because the child is under five years of age and is unable to protect herself from harm."

4

- "The current level of concern for caregiver capability [for] the child is extreme. The mother is currently incarcerated, caregiver capability is not possible because of the mother's drug history and mental stability. Mother has mental health issues."

- "The level of concern for the maltreatment pattern is extreme. Mother has prior history . . . of substance of abuse and a previous case that resulted in termination. The current case consist[s] of the same allegations."

- "The level of concern for response to intervention is extreme. At this time the agency has not heard from the mother. She is incarcerated, however she has not reached out to the agency."

The service plan set out a number tasks and services for Mother to complete before reunification with K.W. could occur. While in jail, Mother was required to "actively participate in drug abuse counseling session[s] where available" and to assist the agency by signing releases for the Department to obtain medical and mental health records. Upon her release, Mother was required (1) to complete a 90-day residential drug treatment program "due to [her] extensive drug abuse history"; (2) to maintain "legal and verifiable employment for at least 6 consecutive months"; (3) to attend NA meetings at least three times per week and provide proof of attendance; (4) "to submit to random UA's no less than 3 times per month"; (5) to "successfully complete a psychological evaluation to assess her emotional and mental state"; and (6) to "refrain from all criminal activity, or interact with anyone involved in criminal activity."

On October 6, 2016, the trial court held a status hearing. Mother did not attend, but she was represented at the hearing by court-appointed counsel. The trial

5

court signed a status-hearing order, approving the family service plan and making it an order of the court. The status order advised "that progress under the service plan will be reviewed at all subsequent hearings, including a review of whether the parties have acquired or learned any specific skills or knowledge stated in the service plan."

On January 19, 2017, Mother again tested positive for cocaine. That same day, Mother appeared at the permanency hearing along with appointed counsel. Mother's relatives, including a great-grandmother, a cousin, and an aunt, also attended the hearing. The court signed an order in which it found that Mother had "not demonstrated adequate and appropriate compliance with the service plan."

The Department filed a permanency report with the trial court on July 7, 2017. It informed the trial court that that Mother had not been consistently cooperating and that Father had not been cooperating at all.

The next month, the court-appointed guardian ad litem with Child Advocates filed a report with the trial court, recommending termination of Mother's and Father's parental rights. In the report, the guardian ad litem summarized her reasons for terminating the parents' rights as follows:

> [Father] was not offered any services due to prior terminations. [Mother] has not successfully completed her services, nor has she demonstrated the ability to provide her child with a safe and stable home environment. [Mother] has a history of substance abuse that has not been adequately addressed and she has tested positive during the pendency of this case. This GAL [guardian ad litem] is also concerned that [Mother] is in a relationship with [Father] who also has a history of substance abuse. In addition, [Mother] disclosed to this GAL that

6

she has been diagnosed with Bipolar disorder and it is unknown if she is receiving any medical treatment.

With regard to K.W.'s placement, the guardian ad litem informed the trial court, "As of January 31, 2017, [K.W.] was moved into an adoptive placement. She is doing well, she is thriving, and there are no concerns. Following the 2nd Permanency hearing a relative study was completed and approved on [Mother's cousin] however the agency declined to place with the family." The guardian ad litem recommended that K.W. remain with her current adoptive foster placement.

A bench trial was conducted on August 17, 2017. Neither Mother nor Father appeared at trial, but they were each represented by appointed counsel.

The Department offered the testimony of M. Robertson, the Department's assigned caseworker. She confirmed that K.W. was removed by the Department as a newborn because Mother was incarcerated at the time of K.W.'s birth, and Father was unwilling to care for her. Regarding Mother's failure to appear at trial, Robertson indicated that Mother was aware of the trial date.

Robertson testified that, other than a parenting program, Mother had not completed the services in her family service plan. Robertson said that, in June 2017, Mother told her that "some of her services [were] done through the probation officer and through M.H.M.R.A.," but Mother failed to provide Robertson with a release to obtain records showing completion of the services.

7

Robertson confirmed that Mother's drug tests were positive for cocaine in September 2016, in October 2016, and in January 2017. Another test in April 2017 was negative. The lab reports for these tests were admitted into evidence. Although no lab report was offered, Robertson also testified that another test, taken in June, after the negative April test, was positive for cocaine.

On cross-examination, Robertson acknowledged that the positive drug tests resulted from the testing of Mother's hair follicles. She agreed that Mother's urine had tested negative. Robertson also acknowledged that the level of cocaine detected in Mother's hair follicles had declined over time.

Lab results from the case involving Sister were also admitted into evidence. These showed that Mother had also tested positive for cocaine during that case in 2014.

Robertson testified that, at the show cause hearing, it had been "brought up" that K.W. had been exposed to HIV. She also stated that K.W. had a heart murmur. However, the report from Child Advocates indicated that the heart murmur had been resolved.

Robertson further testified that K.W. is in a foster home and that the foster family wished to adopt her. K.W. had been living with the foster family since January 2017. According to Robertson, the foster home is ideal for K.W. She stated that the family is loving and caring. She testified that K.W. is doing "extremely

8

well" in the home and that the foster parents are doing a "great job" with K.W. She agreed that K.W. and the foster parents are "very bonded." She indicated that it could be detrimental to remove K.W. from the foster home. Robertson believed it was in K.W.'s best interest to remain with the foster parents.

Robertson was also questioned about placing K.W. with relatives. Robertson testified that Sister had been placed with maternal relatives but had been removed after she was injured. Sister was currently placed with paternal relatives; however, those relatives informed Robertson that they were unable to take K.W.

The record shows that maternal relatives, including a cousin, attended trial and had also attended most hearings. Robertson acknowledged that an evaluation of a maternal cousin's home had been conducted for placement of K.W. When asked why K.W. was not moved to the cousin's home, Robertson responded, "[W]e were Court ordered not to move the child." Robertson testified that the court order resulted from the guardian ad litem's request for an order prohibiting K.W. from being moved from her current adoptive foster home.

The Child Advocate volunteer, R. Edwards, also testified at trial. She testified that she believed it was in K.W.'s best interest to terminate Mother's and Father's parental rights. She offered the following explanation for her opinion:

> Since I've been involved in the case, the mother has been absent, hasn't done any of the treatments. Currently, I cannot get in touch with her. This court date happens to be the exact [sic] one day after the baby's

one year birthday, so we've talked about this case since the very beginning and she's a no show.

On cross-examination, Edwards testified that K.W. was doing very well in the adoptive foster placement. She indicated that she had "no concerns whatsoever" with the current placement. Edwards acknowledged that the home of Mother's cousin had been approved as a suitable home in which to place K.W.; however, Edwards testified that K.W. should stay with the adoptive foster family because she was doing well there.

At the conclusion of trial, the court granted the Department's request for termination of the parent-child relationship between Mother and K.W. On September 19, 2017, the trial court signed a judgment terminating Mother's parental rights, finding that termination was in K.W.'s best interest and that Mother had engaged in the predicate acts listed in Family Code subsections 161.001(b)(1)(E) and (O). Specifically, the trial court found that clear and convincing evidence showed that (1) Mother had engaged in conduct or knowingly placed K.W. with persons who engaged in conduct that endangered her physical or emotional well-being (Subsection (E)), and (2) Mother had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of K.W. (Subsection (O)). The trial court also terminated the parent-child relationship between Father and K.W. and appointed the Department as K.W.'s sole managing conservator.

Mother now appeals the trial court's judgment. Father did not appeal.

## Factual Sufficiency of Best-Interest Finding

Mother presents one issue in which she contends that the evidence was factually insufficient to support the trial court's best-interest finding. She does not challenge the trial court's findings that she had engaged in the statutory predicate acts found in Family Code Subsections 161.001(b)(1)(E) and (O); nor does she challenge the legal sufficiency of the evidence to support the trial court's finding that termination was in K.W.'s best interest.

### A.    Standard of Review

Termination of parental rights requires proof by clear and convincing evidence. *See* TEX. FAM. CODE ANN. § 161.001(b). This heightened standard of review is mandated not only by the Family Code but also by the Due Process Clause of the United States Constitution. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). The Family Code defines clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

Section 161.001(b) of the Family Code provides the method by which a court may involuntarily terminate the parent-child relationship. *See* TEX. FAM. CODE. ANN. § 161.001(b). Under this section, a court may order the termination of the

11

parent-child relationship if the court finds, by clear and convincing evidence, that (1) one or more of the acts enumerated in section 161.001(b)(1) was committed and (2) termination is in the best interest of the child. *Id.* Although termination may not be based solely on the best interest of the child as determined by the trier of fact, *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987), "[o]nly one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Thus, if multiple predicate grounds are found by the trial court, we will affirm on any one ground because only one is necessary for termination of parental rights. *In re G.A.A.*, No. 01–12–01052–CV, 2013 WL 1790230, at *7 (Tex. App.—Houston [1st Dist.] Apr. 25, 2013, no pet.) (mem. op.). Here, the Department was required to establish, by clear and convincing evidence, that Mother's actions satisfied one of the predicate grounds listed in Family Code section 161.001(b)(1) and that termination was in K.W.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)–(2).

In determining a factual-sufficiency point, the higher burden of proof in termination cases also alters the appellate standard of review. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* at 25. In considering whether evidence rises to the level

of being clear and convincing, we must consider whether the evidence is sufficient for the fact finder to reasonably form a firm belief or conviction as to the truth of the allegation sought to be established. *Id.* We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

We are mindful that the natural rights that exist between parents and their children are of constitutional dimension. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Therefore, termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Id.* at 20–21; *see also In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012). However, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent–child relationship, it is also essential that emotional and physical interests of

the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26; *see also In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013).

**B.     Best Interest of K.W.**

1.     *Applicable Legal Principles*

There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2017).

In *Holley v. Adams*, the Supreme Court of Texas identified factors that courts may consider when determining the best interest of the child, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by the individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. 544 S.W.2d 367, 371–72 (Tex. 1976). This is not an exhaustive list, and a court need not have evidence on every element

listed in order to make a valid finding as to the child's best interest. *In re C.H.*, 89 S.W.3d at 27. While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

The Texas Family Code also sets out factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. *See* TEX. FAM. CODE ANN. § 263.307(b); *see also In re R.R.*, 209 S.W.3d at 116 (citing Family Code Section 263.307 and *Holley* as containing factors to consider "when determining whether termination of parental rights is in the best interest of the child"). Among others, the following statutory factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of harm to the child; (4) whether there is a history of substance abuse by the child's family or others that have access to the child's home; (5) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (6) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (7)

whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with minimally adequate health and nutritional care, guidance and supervision, and a safe physical home environment; and (8) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE ANN. § 263.307(b); *R.R.*, 209 S.W.3d at 116.

The evidence supporting the predicate grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent-child relationship. *C.H.*, 89 S.W.3d at 28; *In re H.D.*, No. 01–12–00007–CV, 2013 WL 1928799, at *13 (Tex. App.—Houston [1st Dist.] May 9, 2013, no pet.). Furthermore, in conducting the best-interest analysis, a court may consider not only direct evidence but also may consider circumstantial evidence, subjective factors, and the totality of the evidence. *See H.D.*, 2013 WL 1928799, at *13.

### 2. *Analysis*

Multiple factors support the trial court's determination that termination of Mother's parental rights was in K.W.'s best interest. Mother's history of illegal narcotics abuse, incarceration at the time of K.W.'s birth, and continuing narcotics use while this case was pending supports the best-interest determination. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (explaining that parent's history of drug use is relevant to trial court's best-interest finding); *see In*

16

*re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.) (concluding that a parent's continuous drug use, unstable lifestyle, and criminal record supported best-interest determination); *Dupree v. Tex. Dep't of Protective & Regulatory Servs*., 907 S.W.2d 81, 86–87 (Tex. App.—Dallas 1995, no writ) (allowing factfinder to give significant weight to parent's drug-related conduct in making a best-interest finding); *see also* TEX. FAM. CODE ANN. § 263.307(b)(8) (providing that, in determining best interest, courts may consider history of substance abuse by child's family or others who have access to the child's home). As discussed, the evidence showed that Mother used illegal drugs before K.W.'s birth and was incarcerated at the time of K.W.'s birth, unable to care for K.W. The evidence indicated that Mother had used illegal drugs since before 2014 when Sister was removed from her care in part because of her drug use. Even though she was at risk of losing her parental rights to Sister, Mother continued to use cocaine after Sister was removed from her care.

Similarly, evidence was presented showing that, in this case, despite knowing that she was at risk of losing her parental rights to K.W., Mother continued to use cocaine. The Department presented lab reports indicating that Mother tested positive for cocaine in September 2016, in October 2016, and in January 2017. Robertson also indicated that, after Mother's negative April 2017 test, Mother again tested positive for cocaine in June 2017, less than two months before trial.

17

A factfinder need not ignore a long history of drug dependence and destructive behavior when the evidence established that past substance abuse was more than just "remote and isolated incidents." *In re R.W.*, 129 S.W.3d 732, 741 (Tex. App.—Fort Worth 2004, pet. denied). A parent's drug use is a condition indicative of instability in the home environment because it exposes a child to the possibility that the parent may be impaired or imprisoned. *See In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *P.W. v. Dep't of Family & Protective Servs.*, 403 S.W.3d 471, 479 (Tex. App.—Houston [1st Dist.] 2013, pet. dism'd w.o.j.). Evidence of Mother's past pattern of drug use is relevant not only to the stability of the home she can provide but also to the emotional and physical needs of K.W. now and in the future and to the emotional and physical danger in which K.W. could be placed now and in the future. *See Holley*, 544 S.W.2d at 371–72 (factors two, three, and seven); *see also In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (finding pattern of illegal drug use suggested mother was not willing and able to provide child with safe environment—a primary consideration in determining child's best interest).

Notably, evidence was presented showing that the trial court could have inferred that Mother's drug abuse would likely continue in the future. When determining best interest, a trial court may measure a parent's future conduct by her past conduct. *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.).

18

As discussed, the Department presented evidence indicating that Mother has a consistent history of illegal narcotics use. Mother continued to use cocaine even though she had already lost her parental rights to Sister and her parental rights to K.W. were in jeopardy.

In her brief, Mother challenges the factual sufficiency of the best-interest finding by pointing out that Mother's urine always tested negative. All of the positive tests were tests conducted on Mother's hair follicles. However, no evidence was presented to demonstrate that it would have been unreasonable for the trial court to infer from the positive hair follicle tests that Mother had ingested cocaine. Relatedly, Mother points out that the amount of cocaine shown in the positive drug tests had declined over time. And she emphasizes her negative drug test in April 2017. She claims that this shows that she was reducing her illegal drug usage. However, this does not necessarily refute an inference that Mother continued to use cocaine or that it was probable that she would use cocaine in the future. *Cf. In re T.E.G.*, No. 01–14–00051–CV, 2014 WL 1878919, at *7 (Tex. App.—Houston [1st Dist.] May 8, 2014, no pet.) (mem. op.) (holding that one clean drug test before trial would not render termination for endangerment insufficient when parent also failed to complete substance abuse treatment). Moreover, Robertson's testimony indicated that Mother had a positive drug test in June *after* her negative drug test in April 2017.

The evidence showed that, shortly before K.W.'s birth, Mother pleaded guilty to the third-degree felony offense of harassment of a public servant and was placed on six years deferred adjudication community supervision. The evidence also showed that, at the time of K.W.'s birth, Mother was in jail (although the offense for which she was jailed is unclear). Similar to drug use, engaging in criminal conduct is indicative of poor parental judgment and instability. Drug abuse and felonious conduct places the safety and stability of a child at risk. *See In re M.C.H.*, No. 14–12–00103–CV, 2012 WL 1795123, at *4 (Tex. App.—Houston [14th Dist.] May 17, 2012, no pet.) (mem. op.).

Regarding other best-interest considerations, no evidence was presented addressing K.W.'s desires because she is so young. *See Holley*, 544 S.W.2d at 371–72 (factor one). "When a child is too young to express his desires, the factfinder may consider evidence that the child has spent minimal time with the parent, that a foster family has provided good care for him, and that bonds have developed between the child and the foster family." *In re E.J.*, No. 01–17–00548–CV, 2018 WL 285158, at *4 (Tex. App.—Houston [1st Dist.] Jan. 4, 2018, no pet. h.) (mem. op.) (citing *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.)).

Here, the evidence showed Mother was incarcerated at the time of K.W.'s birth, and K.W. has never been in her care. K.W. was removed from the hospital

soon after her birth and placed in the Department's custody. The evidence also showed that K.W. and her foster parents are very bonded and that the foster parents wish to adopt K.W. Both Robertson and Edwards testified that K.W. was doing very well in the adoptive foster home, and Robertson testified that the foster home was ideal for K.W. *See Holley*, 544 S.W.2d at 371–72 (factors six and seven).

Mother challenges the factual sufficiency of the evidence by pointing out that the permanency report, from July 2017, indicated that K.W. "is placed in a foster placement with [her] sibling, she has been placed there since August 19, 2016." Mother asserts that this contradicts Robertson's testimony that K.W. had been staying with the foster family since January 2017. And Mother points out that there was no other evidence that K.W. had been placed with a sibling. We agree that there appears to be some inconsistency in this evidence; however, "[i]t is well established that, in a bench trial, the judge as the trier of fact weighs the evidence, assesses the credibility of witnesses and resolves conflicts and inconsistencies." *In re D.D.D.K.*, No. 07–09–0101–CV, 2009 WL 4348760, at *6 (Tex. App.—Amarillo Dec. 1, 2009, no pet.) (mem. op.).

Mother also implies that the evidence was factually insufficient to support the best-interest finding because K.W. was not placed either with Sister or with Mother's cousin. However, Robertson testified that the Department had asked the paternal

relatives, with whom Sister had been placed, if they would take K.W., and they said that they were not willing to take her.

Mother is correct that the evidence showed that the maternal cousin's home was approved by the Department as an appropriate placement for K.W. However, the evidence also showed that K.W. was very bonded with her foster parents and that they were providing K.W. a loving and caring home where she was doing very well. And the evidence indicated that K.W.'s guardian ad litem recommended to the trial court that K.W. remain with her foster family. After testifying that K.W. was very bonded with her foster parents, Robertson indicated that it might be detrimental to remove K.W. from the foster home. Robertson and Edwards both testified that they believed it was in K.W.'s best interest to remain in the care of her current foster placement. *See In re B.D.A.*, No. 01–17–00065–CV, 2018 WL 761313, at *12 (Tex. App.—Houston [1st Dist.] Feb. 8, 2018, no pet. h.) (citing evidence that "both the Department caseworker and the child advocate testified that the children's current placements were in their best interests and that the placements were meeting the children's needs" as support for best-interest finding).

Regarding K.W.'s emotional and physical needs now and in the future, Mother points out that evidence showed that any physical abnormalities, such as K.W.'s heart murmur, had been resolved by the time of trial. *See Holley*, 544 S.W.2d at 371–72 (factor two). And, although Robertson mentioned that K.W. had a

possible exposure to HIV, there was no other indication that this was an issue K.W. faced. Mother correctly states that it appears from the record that K.W. is a healthy child with no special needs. Nonetheless, K.W. is a one-year-old child, rendering her "vulnerable if left in the custody of a parent unable or unwilling to protect [her] or to attend to [her] needs." *In re B.D.A.*, 2018 WL 761313, at *11; *see also* TEX. FAM. CODE ANN. § 263.307(b)(1).

A fact finder may infer from a parent's failure to take the initiative to complete the services required to regain possession of her child that she does not have the ability to motivate herself to seek out available resources needed now or in the future. *See In re J.M.,* 2015 WL 1020316, at *7; *see also Holley*, 544 S.W.2d at 371–72 (listing parental abilities of individual seeking custody as best-interest factor). Mother acknowledges that a parent's failure to complete a family service plan may be considered in assessing whether termination was in the best interest of the child. *See, e.g., In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (recognizing that finding that parent failed to complete court-ordered services can be considered in support of best-interest finding); *In re R.R.C.*, No. 04–17–00306–CV, 2017 WL 4413205, at *3 (Tex. App.—San Antonio Oct. 4, 2017, pet. denied) (mem. op.) ("A failure to complete service plans can be one of a number of the acts or omissions by a parent that are relevant to a best-interest analysis.").

Mother also concedes that she did not complete her family service plan. However, Mother points to evidence that she contends excuses her noncompliance. *See Holley*, 544 S.W.2d at 371–72 (factor nine: any excuse for the acts or omissions of the parent). Specifically, Mother asserts that the Department did not present evidence showing that it made referrals to service providers to facilitate her completion of the required services. However, evidence was presented showing that Mother completed some of the services. For instance, evidence was admitted showing that Mother completed a parenting program. Robertson also testified that, less than two months before trial, she met with Mother, and Mother told her that she had completed some other services "through [her] probation officer and through M.H.M.R.A." Robertson stated that Mother also told her that she would give Robertson the records for the completed services. Robertson testified that this was the last conversation she had with Mother, and Mother failed to provide proof that she had completed the services. Robertson also stated that she tried to obtain the records but could not because Mother had not signed a release to obtain the records. Because she engaged in some services, the record supports an inference that services were made available to Mother.

Mother also claims that she did not have sufficient time to complete all of the services because she was incarcerated for a portion of the period that the case was pending. However, "a parent's compliance with a service plan is a factor a fact

24

finder should consider in a determination of best interest, but is not determinative in a sufficiency review." *In re J.C.*, No. 14–17–00707–CV, 2018 WL 894060, *7 (Tex. App.—Houston [14th Dist.] Feb. 15, 2018, no pet. h.) (mem. op.). For this reason, a parent's inability to complete his or her service plan due to incarceration would not preclude a trial court from finding that termination was in the child's best interest. *Id.*

Mother further asserts that the record does not show whether she understood the service plan or the consequences of non-compliance. However, Mother partially complied with the service plan by taking the required drug tests and completing a parenting program. "A reasonable factfinder could have inferred from Mother's partial compliance with the service plan that she was aware of its existence and its content." *In re T.L.B. Jr.*, No. 01–16–00806–CV, 2017 WL 1019520, at *9 (Tex. App.—Houston [1st Dist.] Mar. 16, 2017, no pet.) (mem. op.) (citing *In re K.N.D.*, No. 01–12–00584–CV, 2014 WL 3970642, at *7 (Tex. App.—Houston [1st Dist.] Aug. 14, 2014, no pet.) (mem. op. on reh'g)).

The record also showed that Mother had not contacted Robertson for two months before trial. *See* TEX. FAM. CODE ANN. § 263.307(b)(5) (stating that willingness and ability of child's family to cooperate with and facilitate an appropriate agency's close supervision is considered in determining best interest). And the record shows that Mother was aware of the trial date but nonetheless failed

to appear; thus, demonstrating a lack of motivation to be K.W.'s parent. *See In re J.E., Jr.*, No. 14–16–00850–CV, 2017 WL 1274081, at *7 (Tex. App.—Houston [14th Dist.] Apr. 4, 2017, pet. denied) (mem. op.) (determining that parent's failure to appear at trial was indicative of unwillingness to parent and was supportive of best-interest finding).

## Conclusion

We conclude that, when viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's finding that termination of the parent-child relationship between Mother and K.W. was in K.W.'s best interest or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in the K.W.'s best interest. Therefore, after applying the appropriate standard of review, we hold the evidence is factually sufficient to support the trial court's finding that termination of the parent-child relationship was in K.W.'s best interest.

We overrule K.W.'s sole issue and affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Justices Jennings, Keyes, and Higley.

26